UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

LINDA K. LUNDGREN[1],                                    Civ. No. 09-3395 (RHK/LIB)

       Plaintiff,

v.                                                                          **REPORT AND**
                                                                                **RECOMMENDATION**

MICHAEL J. ASTRUE, Commissioner
of Social Security,

       Defendant.

---

## I.      INTRODUCTION

Pursuant to 42 U.S.C. § 405(g), Plaintiff Linda K. Lundgren seeks judicial review of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits (DIB). The parties have filed cross-motions for summary judgment, which have been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons set forth below, this Court recommends that Plaintiff's motion be denied, and that the Commissioner's motion be granted.

## II.      PROCEDURAL HISTORY

Lundgren filed an application for DIB on August 17, 2006, alleging that she became disabled on February 14, 2003. (T. 14, 82-84). She meets the insured status requirements through December 31, 2012. (T. 16). Lundgren's application was denied initially on November 20, 2006, and upon reconsideration on March 31, 2007. (T. 40-42, 46-50). Lundgren then

---

[1]     Plaintiff's name was misspelled as "Lunda" in the caption of her Complaint. The Court has utilized the correct spelling of Plaintiff's name.

requested a hearing with an Administrative Law Judge, and accordingly, ALJ David K. Gatto conducted a hearing on December 17, 2008.  (T. 14, 25-37, 52).  The ALJ issued an unfavorable decision on March 2, 2009.  (T. 11-24).  Lundgren then filed a request for review with the Appeals Council, which denied her request on October 26, 2009 (T. 1-3, 6-10), thereby making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  See, Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005).

## III.    FACTUAL BACKGROUND

In her August 2006 DIB application, Lundgren alleged that she had been unable to work since February of 2003 due to an anxiety disorder and an affective disorder.  (T. 82-84, 114). Lundgren was 50 years old at the time of the ALJ's decision.  She has a 10th grade education with vocational training as a certified nursing assistant.  (T. 118).  Lundgren has worked as a housekeeper and hospital cleaner in the past.  (T. 23).

Records establish that Lundgren was primarily dependent upon her husband until they were divorced in December of 2007, with no significant full-time employment noted in the record.  (T. 316).  In December of 2006, Lundgren contacted social services for assistance with financial support and housing for herself and her adult daughter, who is receiving SSI for a developmental disability, in contemplation of separation and divorce from her husband.  (T. 279- 286).  She was eventually able to obtain Section 8 housing for herself and her daughter. Lundgren reported that her husband was an alcoholic, which caused significant strain in the relationship, and which eventually led to the divorce.

Evidence in the record demonstrates that Lundgren suffers from physical and mental impairments.  Lundgren concedes that her exertional impairments would cause only minimal

limitations in her ability to engage in work activities (Pl.'s Memo. in Supp., at p. 3), and accordingly, her current appeal of the Commissioner's denial of benefits is based on the effects of her mental impairments.  Medical records make reference to the following diagnoses: bipolar disorder, an anxiety disorder, sleep apnea, depression, and obsessive-compulsive personality traits.

A.    Treatment Records

The medical records date back to 2002.  Records from Park Nicollet Health Services establish treatment by Dr. Bruce Meyer for major depression and an anxiety disorder from 2002 until late 2004, when she switched providers due to insurance issues.  (T. 163, 169, 173, 184-185, 189-190, 193, 195-196, 218-219).  Dr. Meyer saw Lundgren regularly for medication management and treatment, and during this period she was generally treated with Klonopin, Celexa, alprazolam, Provigil, Xanax, Zoloft, Lexapro, and valproic acid.  (T. 169, 173, 175, 184, 190, 195, 204-205, 208-209).  Medical records establish that Lundgren's symptoms included anxiety, panic, fatigue, lack of ambition or motivation, depressed feelings, decreased energy level, problems with memory and concentration, and mood instability (i.e. impulsive behavior, irritability).  (T. 169, 173, 184-185, 189-190, 195, 218).  Although Lundgren's medications were adjusted during this time period, adverse side effects were not frequently reported.   (T. 208)(Lundgren was reporting no side effects); (T. 191)(same).  In addition, Dr. Meyer reported that Lundgren's symptoms were well-controlled with the use of medications, although Lundgren occasionally reported that certain medications made her feel "spacy" or like a "zombie."  (T. 204-205, 191)(Klonopin seemed to control symptoms without side effects); (T. 189)(noting that anxiety was reasonably controlled, and that depression, ambition and energy had improved since adding Provigil); (T. 169)(mood, anxiety, energy and focus improved since adding valproic acid

and were well-controlled with current medications); (T. 215)(noting that Lundgren had discontinued Zoloft because it made her feel spacy); (T. 204)(discontinued Celexa because it made her "feel like a zombie").   Dr. Meyer consistently reported that Lundgren was well-groomed for her appointments.  (T. 173, 184-185, 190, 195, and 218).

On June 17, 2002, Lundgren presented at the Park Nicollet Clinic with complaints of dysphagia, or a muscle spasm in her throat.  (T. 216-217).   Lundgren was assessed with globus hystericus as a symptom of her anxiety disorder, and she was directed to followup with her primary care physician.  (T. 216).  Dr. Rosa Marroquin, her primary care physician, saw her the next day, at which time Lundgren presented with complaints of a dry throat and choking sensation.  (T. 212-213).  Dr. Marroquin treated her with Aciphex.  (T. 213).  On July 8, 2002, Dr. Marroquin saw Lundgren for a follow-up for her dysphagia.   (T. 214-215).   Lundgren reported that she had not experienced much improvement in her symptoms on Aciphex.  (T. 214).  Dr. Marroquin opined that "[i]t is difficult to differentiate how much anxiety is playing a role in her choking sensations."  (T. 215).   Dr. Marroquin discontinued the Acephex and prescribed Klonopin.  (Id.)  Approximately two weeks later, Dr. Marroquin reported that her symptoms were well-controlled with Klonopin treatment and that "all her symptoms have resolved completely."  (T. 208).  At that time, Lundgren stated that she did not feel depressed or anxious, and that she was not experiencing any adverse medication side effects.  (T. 191, 204-205, 208).

Due to changes in her insurance coverage, Lundgren began seeing William Callahan, M.D., for medication management and "brief supportive psychotherapy" on March 8, 2005.  (T. 224-231).  Dr. Callahan continued to treat Lundgren until early 2008, when she began seeing Dr. Meyer again.

Dr. Callahan initially stated that Lundgren's chief complaints were mood swings, anxiety, and fatigue, and he assessed her with bipolar disorder, anxiety disorder with panic, and obsessive/compulsive personality traits.   (T. 224, 231).   During this time, Lundgren was generally treated with valproic acid, Xanax, Lexapro, and citalopram.   (T. 224-237, 269-270, 294, 309-310).   Treatment indicates that Lundgren reported a stable mood and affect (T. 231, 236, 269), increased motivation (T. 233), decreased irritability (T. 233), increased daytime energy (T. 234), and no side effects.   (T. 237, 310).   Medications were adjusted to address issues of daytime fatigue, irritability, and motivation, with success.   (T. 233)(feels increased motivation and interest and decreased irritability since switching from Provigil to Lexapro); (T. 234)(increased daytime energy with reduction of Xanax); (T. 236)(reported stable mood and affect with valproic acid reduction); (T. 269)("her mood disorder is well controlled"); (T. 310)(using valproic acid, citalopram, and Xanax "with benefit and no side effects").   Dr. Callahan noted that Lundgren was experiencing anxiety related to her husband's alcoholism, and that she anticipated eventual separation and divorce.   (T. 237, 270, 294).   In treatment notes dated April 24, 2007, Dr. Callahan opined that "[i]n my professional opinion she is only capable of part-time low stress employment, between ten and fifteen hours a week and no more.   She clearly is permanently, partially disabled."  (T. 294).

On January 9, 2007, Dr. Callahan completed a form for Hennepin County Social Services advising that Lundgren "is seriously mentally ill with three or more functional impairments as indicated below and for whom adult mental health rehabilitative services are medically necessary."  (T. 281-282).   Dr. Callahan indicated a diagnosis of bipolar disorder, and indicated that she had functional impairments in obtaining and maintaining income; in maintaining mental health; in vocational function; and in judgment and problem solving.  (T. 281).

On February 29, 2008, Lundgren returned to Dr. Meyer for treatment for generalized anxiety disorder and a mood disorder.  (T. 326-327).  At that time, Lundgren reported a stable mood with no recent manic symptoms, and increased relaxation since her divorce.  (T. 326). Lundgren also stated that her medications were "working pretty good."  (Id.)  Dr. Meyer observed that Lundgren was nicely groomed and that her affect was a bit bland.  (T. 327).  Dr. Meyer concluded that her anxiety appeared to be under control, and assessed her with a Global Assessment of Functioning (GAF) of 75 to 80, with 80 as the highest GAF in the past year.[2] (Id.)  Dr. Meyer's treatment notes indicate that Lundgren's symptoms were generally under control, and that Lundgren generally reported satisfaction with her medication regimen and denied side effects.  (T. 317-318, 326-327).

B.     Dr. Barnes

On September 26, 2006, Madaline Barnes, Ph.D., L.P., examined Lundgren in connection with her DIB claim.  (T. 239-242).  She noted that Dr. Meyer had diagnosed Lundgren with a nonspecific mood disorder and a nonspecific anxiety disorder.  (T. 240).  Dr. Barnes also noted that Dr. Callahan had diagnosed Lundgren with bipolar disorder, generalized anxiety disorder with panic, and obsessive-compulsive personality traits.  (Id.)  Dr. Barnes stated that the medical records did not establish that Lundgren had ever reported symptoms of obsessive or compulsive personality traits.  (Id.)  During her consultation with Dr. Barnes, Lundgren reported that her symptoms included fatigue, apathy, memory problems, lack of energy, poor concentration, anxiety, and mood swings. (Id.)  Lundgren also reported that her daily activities included

---

[2]     A GAF between 71 and 80 indicates the following level of functioning:  "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporary falling behind in schoolwork)."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR), 34 (4th Ed. Text Revision)(2000).

reading, shopping, simple cooking, doing dishes and laundry, light cleaning, watching television, driving, and visiting with friends. (T. 240-241).

Dr. Barnes observed that Lundgren was well groomed and that her reaction time was slow. (T. 241). Dr. Barnes found that her affect "was generally neutral to slightly positive" and that she was alert and oriented. (Id.) During the examination, Lundgren exhibited "adequate concentration for simple tasks and those that she has already learned well." (Id.) Dr. Barnes observed that Lundgren's memory was intact, her judgment fair to good, her abstract reasoning poor, and her insight fair to poor. (Id.)

Dr. Barnes concluded that Lundgren met the criteria for bipolar disorder with a current GAF of 60[3], and noted that her medication appeared to stabilize her mood. (T. 241-242). (T. 242). Dr. Barnes further opined as follows:

> "Ms. Lundgren is intellectually capable of learning, recalling, and performing slightly complex tasks. Her concentration is adequate for such tasks, although her pace tends to be slow. She is currently handling part time work adequately, but is likely to find full-time work considerably more stressful. Under such a level of stress, she is at high risk to show much more intense mood swings than she is now. She has good social skills and can get along well with coworkers and supervisors. Under typical levels of job stress, she is able to maintain adequate concentration, but her pace slows even more. She is likely to be able to cope with change in the workplace, but might need somewhat more time than most people to adapt."

(T. 242).

---

[3] A GAF of 51-60 indicates the following level of functioning: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR, at 34.

C.      Reviewing Physicians

On November 17, 2006, Thomas L. Kuhlman, Ph.D., L.P., conducted an assessment of

Lundgren's impairments and their effect on her ability work.  (T. 243-262).  Dr. Kuhlman found

that Lundgren had an affective/bipolar disorder.  (T. 246, 249).  Dr. Kuhlman opined that

Lundgren experienced moderate restrictions in her daily living activities; mild difficulties in

maintaining social functioning; and moderate difficulties in maintaining concentration,

persistence, or pace, and as such, that her impairments did not meet or medically equal any of the

listings of impairments.  (T. 256).  Based on a review of the records, Dr. Kuhlman concluded that

Lundgren had the following mental residual functional capacity (RFC):

> "Claimant retains sufficient mental capacity to concentrate on,
> understand, and remember routine, repetitive and 3-4 step
> uncomplicated instructions, but would be markedly impaired for
> detailed or complex/technical instructions.
>
> Claimant's ability to carry out routine, repetitive and 3-4 step tasks
> with adequate persistence and pace would not be significantly
> limited, but would be markedly limited for detailed or
> complex/technical tasks.
>
> Claimant's ability to handle co-worker and public contact would
> be reduced but adequate to handle brief and superficial contact.
>
> Claimant's ability to tolerate and respond appropriately to
> supervision would be reduced but adequate to handle ordinary
> levels of supervision found in a customary work setting.
>
> Claimant's ability to handle stress and pressure in the work place
> would be reduced but adequate to handle the stresses of a routine
> repetitive or a 3-4 step work setting.  It would not be adequate for
> the stress of a detailed or complex work setting."

(T. 262).

On March 17, 2007, Dr. Fullilove reassessed Lundgren's claim of disability.  (T. 275).

Dr. Fullilove noted that Lundgren was in treatment for an affective disorder and anxiety, with

manic episodes occurring approximately once per month.  (Id.)  Dr. Fullilove concluded that despite her mental impairments, her concentration and memory remained intact; she was able to maintain part-time employment; and psychotropic medications have stabilized her symptoms. (Id.)  Dr. Fullilove noted that recent progress notes from her treating physicians indicated "no significant changes in symptoms or functioning, nor in the treatment she is receiving."  (Id.)  Dr. Fullilove concluded that Dr. Kulhlman's assessment was supported and affirmed his assessment as written.  (Id.)

D.      Dr. House

On August 6 and 20, 2007, Joseph J. House, Ed.D., L.P., conducted an adult ADHD assessment of Lundgren at the request of her attorney.  (T. 305-308).  Lundgren reported that her chief complaints was low energy affecting her ability work.  (T. 305).  Dr. House administered a number of tests.  (T. 305-308).  Dr. House reported that Lundgren did not exhibit a significant level of ADHD symptoms, which suggested that she probably did not have ADHD.  (T. 307). Dr. House concluded that Lundgren appeared to be depressed, and that her depression was "most likely a contributing factor to her complaints about low energy and lack of motivation."  (Id.) Dr. House directed Lundgren to follow-up with her treating psychiatrist to assess whether she needed an adjustment to her medication regimen.  (Id.)  Dr. House assessed Lundgren with a GAF of 55.  (Id.)

E.      Other Records

In a Function Report detailing how her impairments affected her daily living activities, Lundgren reported cleaning, doing laundry, doing the dishes, preparing simple meals, shopping, managing the finances and paying bills, caring for her family and dog, driving, providing

transportation for her disabled daughter, and having no difficulties with personal care.  (T. 120-124).  For leisure, she reported reading, visiting friends, going to bars, and attending outdoor festivals.   (T. 124).   She also reported that she has poor memory, concentration, and understanding, and that she has difficulty following instructions and completing tasks.  (T. 125).  She further reported difficulties in dealing with changes to routine, and that her ability to deal with stress depended on the situation.  (T. 126).  Lundgren's husband also provided a lay witness statement, which generally tracked the statements made in Lundgren's own statement.  (T. 128-135).

F.     Plaintiff's Testimony

At the hearing, Lundgren testified that she had been working 16 hours per week as a housekeeper in a senior citizen apartment complex for approximately two years.  (T. 29).  She testified that one or two days per month she is unable to work her scheduled hours because she feels overwhelmed, wore out, and stressed.   (T. 30).   Her current employer tolerates her unscheduled absences from work.  (Id.)  Lundgren stated that her former fulltime employment ended because the employer was not willing to accommodate her unscheduled absences from work.  (T. 30-31).  Lundgren testified that she believed she would shut down emotionally and physically if she worked more hours than she was presently working.  (T. 31).  Lundgren further stated that her present employer had offered her more hours, but she did not take the additional hours because she would have been unable to handle the hours.  (T. 31-32).

Lundgren stated that her medications make her feel tired and drowsy.  (T. 32).   She relaxes when she is not working.  (Id.)  She also does light housework, cooks, and shops.  (Id.)

She testified that she was living with her daughter, who helped with cleaning and sometimes cooking. (T. 32-33).

     G.     VE's Testimony

At the hearing, the ALJ elicited the testimony of William Villa, a vocational expert (VE). (T. 33-36). The ALJ asked the VE to assume an individual between the ages of 44 and 50 with a diagnosis of bipolar and affective disorder, who was limited to unskilled work; brief and superficial contact with the public and coworkers; and no rapid or frequent changes in work routine to account for stress tolerance. (T. 33). The VE testified that the individual would be able to perform the duties of a cleaner or housekeeper with 16,000 to 18,000 jobs in the regional economy; hand packaging with 7,800 to 8,000 jobs in the regional economy; laundry worker with 3,300 to 3,500 jobs in the regional economy. (T. 33-34). If the individual needed to be absent from work more than two times per month, the VE stated that she would not be capable of competitive employment. (T. 34-35). The VE further testified that the individual could not be competitively employed if she was limited to working 10 to 15 hours per week. (T. 35). The VE also testified that if the time required to adapt to routine work changes was inordinately long, the individual would not be capable of engaging in competitive employment. (Id.)

## IV.    THE ALJ'S DECISION

In concluding that Lundgren was not disabled, the ALJ followed the sequential, five-step process set forth in the Code of Federal Regulations. See, 20 C.F.R. § 404.1520. Under the five-step sequential process, a claimant is disabled only if 1) they are is not presently engaged in substantial gainful activity; 2) they have a severe impairment that significantly limits their ability to perform basic work activities; 3) their impairment is presumptively disabling; 4) if their

impairment is not presumptively disabling, the claimant cannot perform their past relevant work; and 5) if the claimant cannot perform their past relevant work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.  Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

At the first step, the ALJ found that Lundgren had not engaged in substantial gainful activity since the alleged onset date of February 14, 2003.  (T. 16).  At step two, the ALJ found that Lundgren's severe impairments were bipolar disorder with depression and anxiety.  (Id.) Next, the ALJ concluded that Lundgren's impairments considered individually or in combination did not meet or medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (T. 17-18).  After considering the evidence in the record, the ALJ concluded that Lundgren had the RFC to perform a full range of work at all exertional levels with the following non-exertional limitations: she would be limited to unskilled work with brief and superficial contact with the public and co-workers and no rapid or frequent changes in work routine to account for reduced stress tolerance.  (T. 18).

In reaching this conclusion, the ALJ concluded that the objective medical evidence did not support Lundgren's claim that her impairments resulted in a disability.  (T. 19).  Based on a thorough review of the treatment notes and medical records, the ALJ concluded that "the medical evidence of record supports that the claimant was first diagnosed with depression and anxiety in 2002 and later diagnosed with bipolar disorder due to the ups and downs of her moods."  (T. 21). The ALJ found that Lundgren had been treated for many years with psychotropic medications, which controlled her symptoms.  (Id.)  The ALJ found that Lundgren had never received serious, ongoing psychotherapy, but rather, had only received brief counseling during periods of anxiety. (Id.)   The ALJ further concluded that the medical evidence established that Lundgren's

"concentration is only moderately limited and she gets along with others and in fact has good friends with whom she socializes." (Id.)

The ALJ found that Lundgren's statements regarding the intensity, persistence, and limiting effects of her symptoms were not entirely credible. (Id.) First, the ALJ stated that the objective medical evidence did not support the severity of Lundgren's allegations. (Id.) In addition, the ALJ found that Lundgren's credibility was undermined by several inconsistencies in the record. (Id.) In particular, the ALJ found that Lundgren's credibility was undermined because her allegations of disability were inconsistent with the opinion of Dr. Callahan, who found that her symptoms would not preclude her from part-time work. (Id.) The ALJ further noted that Lundgren's allegations regarding her ability to concentrate and handle work-related stress were not entirely credible. (Id.) In particular, the ALJ found those allegations inconsistent with her ability to drive an automobile, read, cook, and watch television on a regular basis, and concluded that these activities were inconsistent with her claimed inability to maintain concentration, persistence and pace to perform the basic mental activities of work. (Id.) The ALJ also found that Lundgren's failure to seek aggressive psychotherapy was also inconsistent with her subjective allegations of disability. (T. 22).

In reviewing the opinion evidence in the record, the ALJ gave great weight to the opinion of Dr. Barnes, the consulting psychologist. (Id.) The ALJ found that Dr. Barnes gave a thorough psychological evaluation when rendering her opinion, which stated that Lundgren was capable of brief and superficial contact with the public and workers; that she was not capable of rapid or frequent changes in work routine; and that she was capable of working in a low stress environment. (Id.) The ALJ also found that the opinions of Dr. Kuhlman and Dr. Fullilove were

consistent with, and well-supported by objective medical evidence.  (Id.)  Accordingly, the ALJ

concluded that their opinions were an accurate representation of Lundgren's limitations.  (Id.)

     The ALJ also considered the opinion of Dr. Callahan, who did not provide a function-by-

function analysis of Lundgren's mental RFC.  (Id.) The ALJ noted that even though Dr. Callahan

stated that Lundgren was only capable of part-time work, he clearly did not find that Lundgren

was incapable of all work activities.  (Id.)  The ALJ also considered the opinion of Dr. House,

who assessed Lundgren with a GAF of 55, which indicated only moderate symptoms, and which

the ALJ found consistent with the other medical evidence in the record.  (Id.)

     At the last steps, the ALJ concluded that Lundgren was unable to perform any past

relevant work.  (Id.)  With Lundgren's RFC and the testimony of the VE in mind, the ALJ

concluded that Lundgren was capable of performing the jobs of handler and laundry room

worker, which existed in significant numbers in the regional economy.  (T. 24).

## V.   STANDARD OF REVIEW

     The Commissioner's decision must be affirmed if it conforms to the law and is supported

by substantial evidence on the record as a whole.  See, Moore ex rel. Moore v. Barnhart, 413

F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).   As the

Court of Appeals has repeatedly stated, "the 'substantial evidence in the record as a whole'

standard is not synonymous with the less rigorous 'substantial evidence' standard", Burress v.

Apfel, 141 F.3d 875, 878 (8th Cir. 1998):

> "'Substantial evidence' is merely such 'relevant evidence that a
> reasonable mind might accept as adequate to support a conclusion.'
> 'Substantial evidence on the record as a whole,' however, requires
> a more scrutinizing analysis.  In the review of an administrative
> decision, 'the substantiality of evidence must take into account

> whatever in the record fairly detracts from its weight.' Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."

Id., quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989).  "Substantial evidence is 'less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.'"  Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006), quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000).   In reviewing the Commissioner's decision, "we do not substitute our own view of the evidence for that of the Commissioner . . . [and] [w]hether the record supports a contrary result or whether we might decide the facts differently is immaterial."  Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005), citing Kelley v. Barnhart, 372 F.3d 958, 960 (8th Cir. 2004).  Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'"  Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004), quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996); Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)("as long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, . . . or 'because we would have decided the case differently.'")[citations omitted].

## VI.   DISCUSSION

Lundgren does not challenge the ALJ's findings at the first three steps of the sequential evaluation.  Rather, Lundgren argues that the ALJ erred in weighing the medical source opinion, and that the ALJ's RFC determination was not supported by substantial evidence on the record as a whole.  The Court will first address the ALJ's evaluation of the medical opinion evidence.

A.      Whether the ALJ Properly Evaluated the Medical Source Opinions

In weighing the medical opinion evidence, Lundgren argues that the ALJ failed to give proper weight to the opinions of Dr. Callahan, a treating physician, and Dr. Barnes, a consulting physician, and that he relied too heavily on the opinions of the State Agency physicians.

"In deciding whether a claimant is disabled, the ALJ considers medical opinions along with 'the rest of the relevant evidence' in the record." Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008), quoting Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007). "Generally, 'a treating physician's opinion is due controlling weight if that opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004), quoting Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). Nevertheless, "[a] treating physician's opinion 'does not automatically control or obviate the need to evaluate the record as [a] whole.'" Id.

There is no dispute that Dr. Callahan is a treating physician. However, the Court finds that the ALJ did not err in finding that Dr. Callahan's opinion is not entitled to controlling weight. First, Dr. Callahan's opinion that Lundgren is disabled from full-time employment is clearly not entitled to deference by the ALJ. See, Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005)("A medical source opinion that an applicant is 'disabled' or 'unable to work'. . . involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight."), citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

Significantly, the ALJ noted that Dr. Callahan did not perform a function-by-function assessment of Lundgren's functional limitations, but rather, he merely stated in a conclusory fashion that Lundgren would be incapable of tolerating the stress of a fulltime employment setting.  The ALJ did not err in finding that this opinion is not entitled to controlling weight, since "[a] treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements."  Peipgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996), citing Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991); Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995)("when the physician's opinion amounts only to a conclusory statement, it is not entitled to greater weight than other physician's opinion"); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986)(when a treating physician's statements are conclusory, the ALJ may discount his or her opinion in favor of the contrary medical opinion of a consulting physician).  Dr. Callahan's opinion did not cite to any medical evidence, and it did not provide any elaboration regarding the actual affects that Lundgren's stress tolerance would have on her functional abilities.  See, Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) (finding that treating physician's conclusory opinion, which cited no medical evidence and provided no elaboration, was not entitled to controlling weight).  As such, the Court finds ample support for the ALJ's decision not to give controlling weight to the opinion of Dr. Callahan. [4]

---

[4]     These reasons would be enough to give less than controlling weight to the opinion of Dr. Callahan.  However, Lundgren also objects on the grounds that the ALJ considered the fact that Dr. Callahan did not find Lundgren incapable of all work activity.  Lundgren argues that this demonstrates the ALJ applied the wrong standard.  In particular, Lundgren argues that in order to be found disabled, a claimant need not be found incapable of all work activity; rather, the claimant must be found incapable of sustaining fulltime employment on a regular and continuing basis.  See e.g., Bladow v. Apfel, 205 F.3d 356, 359 (8th Cir. 2000)(finding of disability requires inability to sustain fulltime employment).  The Court disagrees, and finds that the ALJ did not apply the wrong standard.  While part-time work, by itself, cannot support an ALJ's decision, in

Next, Lundgren argues that the ALJ failed to give proper weight to the opinion of Dr. Barnes.   The ALJ stated that Dr. Barnes' opinion was based on a thorough psychological evaluation, and that he gave her opinion great weight.   The ALJ noted that Dr. Barnes concluded that Lundgren was capable of brief and superficial contact with the public and co-workers, that she would not be able to cope with rapid and frequent changes in work routine, and that she would be able to work in a low-stress work environment.   Even though the ALJ stated that he gave great weight to the opinion of Dr. Barnes, Lundgren argues that the ALJ "merely paid lip-service to the opinion of Dr. Barnes and failed to include the significant portions of her residual functional capacity opinion in his ultimate finding."  (Pl.'s Memo. in Supp., at p. 15).   Lundgren does not identify what portions of Dr. Barnes' opinion the ALJ failed to adequately incorporate into his RFC determination, but it appears that her argument is based on his failure to incorporate limitations based on pace and stress tolerance.   The Court disagrees.

---

the present case the ALJ was merely indicating his belief that Lundgren's ability to engage in part-time employment was relevant in assessing whether she is capable of engaging in fulltime, gainful employment.   See Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004)(claimant's part-time work is one factor that may be considered by the ALJ).   While the ALJ may have expressed his decision more clearly, the Court finds no basis for concluding that the ALJ applied the wrong standard.   "[A]n arguable deficiency in opinion-writing technique does not require us to set aside an administrative finding when that deficiency had no bearing on the outcome."  Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008)(internal quotations omitted).   As detailed in the body of this Report, the ALJ properly explained and supported his conclusion that Lundgren is capable of sustaining full-time employment on a regular and continuing basis.

Lundgren also argues that in discounting Dr. Callahan's opinion, the ALJ drew improper inferences from the medical reports.  (Pl.'s Reply, at p. 4).   This argument is not well-articulated, but the Court finds this argument unpersuasive in any event.   It is well-established that an ALJ may discount a treating physician's opinion where other assessments are supported by superior medical evidence or the opinions are inconsistent with other substantial evidence in the record. See, Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008).   Moreover, even though an ALJ's RFC determination must be supported by some medical evidence, the ultimate determination of a claimant's RFC remains with the ALJ.   Cox v. Astrue, 495 F.3d 614, 619-20 (8th Cir. 2007)("Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.")

Dr. Barnes assigned a GAF of 60 to Lundgren, which indicates only moderate symptoms. (T. 20); see, Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)(physician's opinion that claimant had GAF of 58 indicated moderate symptoms, which was inconsistent with his opinion that the claimant suffered from extreme limitations).   Dr. Barnes concluded that Lundgren was capable of performing "slightly complex tasks" with a slow pace; that she would have adequate concentration but a slower pace under typical levels of job stress; that she would likely find full-time work more stressful than part-time employment; that she had good social skills; and that she would be capable of coping with changes to routine in the workplace although she may need additional time to adapt.

The ALJ properly accounted for Lundgren's reduced stress tolerance by limiting her to simple, unskilled work[5]; by excluding rapid or frequent changes in work routine; and by limiting her to brief and superficial contact with the public and co-workers.  Moreover, the ALJ properly recognized that her pace would slow while engaging in slightly complex tasks by limiting her to the simple tasks that would be characterized by unskilled work.  The Court is mindful that Dr. Barnes opined that Lundgren would likely find fulltime work more stressful.  Nevertheless, she did not state that Lundgren was entirely incapable of dealing with such stress under the right circumstances, and as described above, the Court believes that the ALJ's RFC determination adequately reflected Lundgren's reduced stress tolerance.  Moreover, since Dr. Barnes was not a treating physician, her opinion was not entitled to controlling weight, and consequently, we will not disturb the ALJ's decision simply because his decision was not entirely based on Dr. Barnes' opinion.

---

[5]     Social Security Regulations define unskilled work as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 404.1568.

Significantly, the ALJ also considered the opinions of Dr. House, Dr. Kuhlman, and Dr. Fullilove.  Lundgren does not object to the weight given to the opinion of Dr. House by the ALJ. Dr. House did not provide a function-by-function assessment of Lundgren's mental RFC, but he found that Lundgren did not have adult ADHD, and further assigned a GAF of 55 to Lundgren, which is indicative of only moderate symptoms.  The ALJ stated that this was consistent with other medical evidence in the record.

Lastly, the ALJ found the opinions of Dr. Kuhlman and Dr. Fullilove well-supported by the objective medical evidence.  As such, he accepted their opinions "as an accurate representation of the claimant's status."  (T. 22).  Lundgren argues that the opinions of Dr. Kuhlman and Dr. Fullilove **were not** well-supported because they were not based on a review of the entire record.  According to Lundgren, "a substantial amount of medical evidence regarding Lundgren's conditions and the limitations those conditions imposed . . . was developed after" the date of the reviewing physicians' opinions.  Lundgren further argues that their opinions cannot constitute substantial evidence of her ability to engage in fulltime employment on a regular and continuing basis.

The Court declines to accept Lundgren's contention that the reviewing physicians' opinions must be rejected because they were not based on a review of the entire record.  Dr. Kuhlman rendered his opinion on November 17, 2006, and Dr. Fullilove rendered his opinion on March 17, 2007.  They both had access to Lundgren's regular treatment records from both Dr. Meyer and Dr. Callahan, which dated back to 2002.  At that time, Dr. Callahan had been treating Lundgren regularly for approximately one year and a half, and more than two years of Dr. Meyer's treatment notes were available.  In addition, both physicians had access to Dr. Barnes' opinion, which was dated September of 2006.  Most importantly, Lundgren's medical records –

including those which postdate the opinions of the reviewing physicians – demonstrate that Lundgren's condition remained stable, with no notable changes in symptoms or treatment.

Lundgren argues that the reviewing physicians' opinions were not reliable because they did not have access to the opinion of Dr. Callahan, who concluded she was unable to engage in fulltime employment.  However, Dr. Callahan did not conduct a function-by-function analysis of Lundgren's mental RFC, and his opinion was vague and conclusory as the Court has already discussed.  As such, the Court does not believe that the reviewing physicians' medical opinions were rendered without knowledge of a crucial piece of evidence.  An ALJ "may consider all evidence of record, including medical records and opinions dated prior to the alleged onset date, when there is no evidence of deterioration or progression of symptoms."  Pirtle v. Astrue, 479 F.3d 931, 934 (8th Cir. 2007), citing Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).  The ALJ was clearly entitled to consider the reviewing physicians' opinions, which were rendered during the relevant time period, since there is no evidence that Lundgren's condition changed or deteriorated or that crucial evidence was not considered.

Nor does the Court believe that the ALJ otherwise gave undue weight to the opinions of the reviewing physicians.  "[T]he opinions of nonexamining sources are generally, but not always, given less weight than those of examining sources."  Willcockson v. Astrue, 540 F.3d 878, 880 (8th Cir. 2008).  As such, the opinion of a reviewing physician, standing alone, cannot constitute substantial evidence on the record as a whole.  See, Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir.2004) ("we do not consider the opinions of non-examining, consulting physicians standing alone to be 'substantial evidence.'").  However, in the present case, the ALJ did not rely solely on the opinions of the reviewing physicians, but rather, he conducted an independent review of all of the evidence in the record.  See, Krogmeier v. Barnhart, 294 F.3d

1019, 1024 (8th Cir. 2002) ("Even though the opinion of a consulting physician alone does not generally constitute substantial evidence . . . the ALJ did not rely solely on the opinion of the consulting physician, but also conducted an independent review of the medical evidence"); Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995) ("Although it is true that the opinion of a reviewing physician alone does not constitute substantial evidence . . . the ALJ did not rely solely on the reviewing physicians in this case. The ALJ also conducted an independent analysis of the medical evidence").  Moreover, having determined that Dr. Callahan's opinion was not entitled to controlling weight, the ALJ was clearly authorized to consider other medical source opinions in the record.  See, Hacker v. Barnhart, 459 F.3d 934, 939 (8th Cir. 2006) (having found that the opinions of the treating physicians were inconsistent with substantial evidence in the record, "the ALJ was clearly authorized to consider the opinions of other physicians").  As noted, the ALJ considered the opinions of several physicians, and he based his RFC determination on all of their opinions – not just the opinions of the reviewing physicians – and he also considered Lundgren's credibility and her medical records in rendering his decision.  As such, the Court finds no basis for concluding that the ALJ committed reversible error by giving undue weight to the opinions of the reviewing physicians.

In the present case, the ALJ thoroughly reviewed the entirety of the record, weighed the competing evidence, and based his resolution of the medical opinions on substantial evidence on the record as a whole.  The ALJ appropriately evaluated the competing medical opinions by justifying the weight that was given to each of the medical source opinions.  See, Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)("Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation"), citing 20 C.F.R. §

404.1527(d)(2).  It is the province of the ALJ, not the Court, to weigh and resolve conflicting evidence provided by medical professionals.  See, Bentley v. Shalala, 52 F.3d 784, 785 (8th Cir. 1995)("It is the ALJ's function to resolve conflicts among 'the various treating and examining physicians."); Wilson v. Apfel, 172 F.3d 539, 542 (8th Cir. 1999)(when considering the weight to be given to the medical source opinions, the entire record must be evaluated as a whole).  The Court finds no error in the manner in which the ALJ weighed the medical opinion evidence and finds that that the ALJ reached a reasonable resolution based on the record as a whole, which should not now be disturbed.

    B.    Whether the ALJ's Decision Was Supported by Substantial Evidence in the Record as a Whole

Having concluded that the ALJ properly weighed and resolved conflicts among the medical source opinions of record, the Court must now determine whether the ALJ's decision was otherwise supported by substantial evidence on the record as a whole.  The Court finds that it was.

"It is 'the ALJ's responsibility to determine claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and claimant's own description of her limitations.'" Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007), quoting Anderson, 51 F.3d at 779.  Nevertheless, a claimant's RFC remains a medical question, and therefore, "some medical evidence 'must support the determination of the claimant's residual functional capacity.'" Krogmeier, 294 F.3d at 1023, quoting Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001).  As such, "'the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Id.  Although some medical evidence must support an RFC assessment, the "regulations make clear that residual

functional capacity is a determination based upon all the record evidence."  Dykes v. Apfel, 223

F.3d 865, 866-67 (8th Cir. 2000).

The Court has reviewed the record and the ALJ's decision and finds that the ALJ's RFC

determination was supported by substantial evidence in the record as a whole.  The ALJ noted

that Lundgren has been treated for many years with psychotropic medications, and that they have

generally controlled her symptoms.  See, Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009)("If

an impairment can be controlled by treatment or medication, it cannot be considered disabling.");

Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010)(claimant suffered from a psychotic episode,

but record established that "[h]er symptoms have since been effectively controlled by her

medication"); Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009)("On balance, although

Davidson's symptoms of depression sometimes worsened and required adjustments in his

medication, the ALJ's determination that Davison's depression was generally controllable is

supported by substantial evidence.")  The Court finds this conclusion is well-supported by the

record.

The ALJ also noted that Lundgren's treatment established that she only received brief

supportive counseling with medication adjustments, that she had never received serious ongoing

psychotherapy, and that she had never required hospitalization.  The ALJ concluded, and the

Court agrees, that if Lundgren's symptoms were as severe as she alleges she would have sought

more aggressive psychotherapy and treatment, which she did not.  Tate v. Apfel, 167 F.3d 1191,

1197 (8th Cir. 1999)(ALJ may properly consider claimant's failure to pursue more aggressive

treatment that is available); Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006)(credibility

was undermined by lack of aggressive medical treatment).  The ALJ also found relevant that

Lundgren lived with her disabled daughter and functioned as a parent and homemaker by caring

for pets, driving, shopping, maintaining independent self-care, and managing her finances.   The ALJ found that this indicated her concentration was only moderately limited.  He also noted that she was capable of socializing with friends.

The ALJ also found that Lundgren's subjective statements regarding the intensity, persistence and limiting effects of her symptoms were not entirely credible, given the objective medical evidence and inconsistencies in the record.[6]  As detailed above, the ALJ considered the medical source opinions.  The ALJ noted that examining physicians had generally assigned a GAF of 51-60, which was consistent with only moderate symptoms.  Moreover, Dr. Meyer, a treating physician, assigned a GAF of 75-80 in February of 2008, which indicated that any symptoms experienced by Lundgren were normal reactions to psychological stress that most people experienced.   This evidence was properly considered as evidence of Lundgren's functional ability to engage in fulltime work.  See, Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010)(noting that GAF scores may "be used to assist the ALJ in assessing the level of a claimant's functioning", and finding that a history of GAF scores between 52 and 60 "taken as a whole, indicate [the claimant] has moderate symptoms or moderate difficulty in social, occupational or school functioning").

---

[6]      To the extent that the ALJ's decision is based on his conclusion that Lundgren's subjective allegations were not credible, she has not challenged the ALJ's credibility determination.  In any event, the Court finds that the ALJ's credibility determination must be affirmed.  Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008)("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination").  Here, the ALJ found the following evidence inconsistent with the severity of her symptoms, including her ability to handle stress and to maintain concentration, persistence, and pace for fulltime employment: the fact that she was capable of handling part-time employment; that she is able to drive an automobile, read, cook, and watch television on a regular basis; and that she never pursued aggressive psychotherapy despite the severity of her allegations.   Here, the ALJ explicitly discredited Lundgren's subjective allegations based on well-supported and evidence-based reasons.  As such, the Court will defer to that determination.

In sum, the ALJ considered a number of factors in determining Lundgren's RFC, including her course of treatment, her daily living activities, her part-time work, the medical source opinions, and her medical records. The ALJ thoroughly reviewed the record and based his RFC determination on substantial evidence in the record as a whole. The Court cannot find that this resolution of the evidence was unreasonable and therefore, finds that the ALJ did not err in determining Lundgren's RFC.

The Court recognizes that Lundgren appears to argue that the ALJ's RFC determination was erroneous because it did not include attendance and pace limitations, which would have shown she was not capable of sustaining competitive employment on a regular and continuing basis. However, Lundgren fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible. See, Tellez, 403 F.3d at 957. Based on his review of the medical opinions and other evidence in the record, the ALJ concluded that Lundgren could handle the stress and maintain pace consistent with fulltime employment within the limitations evidenced in his RFC determination. The ALJ was not obligated to include limitations based on opinions or allegations that he properly disregarded. See, Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006).

Next, Lundgren argues that the ALJ erred in relying on the testimony of the VE in finding that she was not disabled. "In posing hypothetical questions to a vocational expert, an ALJ must include all impairments he finds supported by the administrative record." Gilbert v. Apfel, 175 F.3d 602, 604 (8th Cir. 1999), citing House v. Shalala, 34 F.3d 691, 694 (8th Cir. 1994). Where a hypothetical accurately sets forth all of the claimant's impairments, a vocational expert's testimony constitutes substantial evidence supporting the ALJ's decision. Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008). The ALJ's hypothetical was based on his RFC

determination, which the Court has already deemed an accurate representation of Lundgren's limitations, and consequently, it was a proper basis for concluding that Lundgren was not disabled.  See, Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005)("Because the vocational expert was presented with a proper hypothetical, her testimony that there were significant numbers of jobs that Guilliams could perform despite his limitations constitutes substantial evidence supporting the ALJ's determination that Guilliams was not disabled.")

To the extent that Lundgren argues that the ALJ should have found her disabled because the VE testified that she would be unable to sustain employment if she required an "inordinately" long time to adapt to changes in the workplace, the Court finds no merit to this argument. Significantly, the VE did not testify that Lundgren would be incapable of competitive employment simply because she required additional time to adapt to workplace changes.  Rather, the VE stated that she would not be capable of competitive employment if she required an "inordinately" long time to adapt to changes, and the record does not establish such an extreme limitation.  As such, the VE's testimony does not compel a finding of disability on this basis.

Similarly, the ALJ was not compelled to find Lundgren disabled on the grounds that the VE testified that Lundgren would not be capable of competitive employment if she was absent from work more than two times per month.  As described above, the ALJ found that Lundgren's allegations as to the severity and limiting effects of her symptoms were not entirely credible, and he concluded that she was capable of bearing the stress under the work conditions delineated in his RFC assessment.  The Court has already found the ALJ's RFC assessment was supported by substantial evidence in the record as a whole, and consequently, the VE's testimony does not compel a conclusion that Lundgren is disabled on this basis either.

Lastly, Lundgren suggests that if the ALJ found Dr. Callahan's opinion inadequate, he had a duty to re-contact Dr. Callahan for a supplemental opinion.   (Pl.'s Reply, at p. 5). Lundgren raised this argument for the first time in her Reply Brief, and the Court generally does not consider arguments made for the first time in a reply.  Britton v. Astrue, 622 F.Supp.2d 771, 790 (D. Minn. 2008).  In any event, the issue may be easily resolved.

It is well-settled "that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case."  Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004)[citing cases],   Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly so that '"deserving claimants who apply for benefits receive justice.'"  Wilcutts v. Apfel, 143 F.3d 1134, 1138 (8th Cir. 1998), quoting Battles v. Shalala, 36 F.3d 43, 44 (8th Cir. 1994). Moreover, because "[t]he ALJ possesses no interest in denying benefits and must act neutrally in developing the record," this duty extends even to those cases where the claimant is represented by counsel at the administrative hearing. Snead, 360 F.3d at 838.   "Where the ALJ fails to fully develop the record, this court may remand for the taking of further evidence."  Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir. 2002), citing Payton v. Shalala, 25 F.3d 684, 686 (8th Cir. 1994). "[R]eversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial."  Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995), citing Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993).

 "[T]he ALJ is not required 'to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.'"  Goff, 421 F.3d at 791, quoting Stormo, 377 F.3d at 806; Ellis, 392 F.3d at 994 ("Although that duty may include re-contacting a treating physician for clarification of an opinion, that duty arises only if a crucial issue is undeveloped");

George v. Astrue, 301 Fed. Appx. 581, 582-83 (8th Cir. 2008)(noting that the "proper inquiry is whether record contained sufficient evidence for fair determination" where plaintiff argued that ALJ did not fully and fairly develop the record).

In the present case, the Court has already found that the ALJ's failure to give controlling weight to the opinion of Dr. Callahan was not erroneous, and the ALJ conducted a thorough review of the evidence of record in reaching his decision, which provided an ample basis for assessing Lundgren's functional limitations in the workplace. See, Samons v. Astrue, 497 F.3d 813, 819 (8th Cir. 2007)(concluding that because the court had already upheld the ALJ's decision not to give substantial weight to her treating physician's opinion as conclusory and inconsistent with the record, the ALJ did not have a duty to contact the treating physician for a further explanation of his opinion).   There was no crucial issue that remained undeveloped, and therefore, the Court concludes that the ALJ did not err in failing to recontact Dr. Callahan for a supplemental opinion.

**VII.   CONCLUSION**

In sum, based on the record as a whole, the Court cannot conclude that the ALJ's decision was outside the available zone of choice.   It is well-established that "the mere fact that some evidence may support the opposite conclusion than that reached by the Commissioner does not compel the Court to reverse the decision of the ALJ."   Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004), citing Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996).   Where the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must defer to that decision.   The ALJ conducted a thorough review of the medical evidence, the medical source opinions, and Lundgren's own statements regarding her condition,

and concluded that she was not disabled.  The Court finds substantial evidence in the record as a whole to support that decision, and therefore, the Court finds that summary judgment should be entered in favor of the Commissioner.

Based on the foregoing and all of the files, records and proceedings herein, IT IS HEREBY RECOMMENDED that:

1.    Plaintiff's Motion for Summary Judgment [Docket No. 10] be DENIED; and

2.    Defendant's Motion for Summary Judgment [Docket No. 17] be GRANTED.

DATED: February 7, 2011

_____
LEO I. BRISBOIS
United States Magistrate Judge

# N O T I C E

Pursuant to Local Rule 72.2, any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by February 22, 2011** a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within fourteen days of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.   This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.